**McLaurin v New York City Health & Hosps. Corp.**

2025 NY Slip Op 31025(U)

March 25, 2025

Supreme Court, Kings County

Docket Number: Index No. 502261/2020

Judge: Consuelo Mallafre Melendez

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

**At an IAS Term, Part MMESP-7 of the Supreme Court of the State of NY, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 25th day of March 2025.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------------------X
Harriet McLaurin, As Administrator of the Estate of Willieann
McLaurin, deceased and Harriet McLaurin, Individually,

      Plaintiff,

   -against-


New York City Health and Hospitals Corporation and John and
Jane Does, M.D. and R.N., (1-10), names being fictitious and
unknown persons intended being physicians, nurses and other
personnel who treated Plaintiff Willieann McLaurin at East
New York Diagnostics & Treatment Center on November 1,
2018 and prior and subsequent thereafter,

      Defendants.
-----------------------------------------------------------------------------X

**DECISION & ORDER**

Index No. 502261/2020
Mo. Seq. 2

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

NYSCEF #s:  44 – 46, 48 – 70, 96, 111 – 113, 114 – 119

Defendant New York City Health and Hospitals Corporation ("NYCHHC") moves (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor. Plaintiff opposes the motion.

The Decedent commenced this action on January 29, 2020, asserting claims of medical malpractice against NYCHHC. Decedent passed away after commencement of the action, and the complaint was amended on March 6, 2021, to substitute the administrator of her estate as Plaintiff and add causes of action for wrongful death and loss of services. The claims arise from an alleged failure to diagnose Decedent's lung cancer at East New York Diagnostic and Treatment Center ("ENY"), also known as Gotham Health East New York.

Prior to the events at issue, Decedent had treated at ENY as her primary health care provider since 2013. As of November 2018, she was 54 years old and had a history of smoking for over 30 years.

1

[* 1]

Decedent presented to ENY on August 22, 2017 for a routine follow-up and general health examination. She had complaints of headaches, bilateral leg edema, and a neck rash. She was diagnosed with atopic dermatitis and prescribed a hydrocortisone cream.

She presented again as a walk-in patient on October 25, 2017 with a sore throat, nasal congestion, fever, and green phlegm. She was assessed by nurse practitioner Lurline Dixon, diagnosed with an upper respiratory infection, and prescribed antibiotics and nasal spray.

Decedent had a routine follow-up primary care exam at ENY on November 27, 2017. She did not report any coughing or respiratory symptoms, and her chest examination was clear. She had additional visits to ENY from December 2017 through February 2018 for podiatry complaints and a gynecological exam.

On February 26, 2018, Decedent presented with complaints of "sore throat, cough, nasal congestion, and chest discomfort" for one week. She was evaluated by nurse practitioner Corine Armand, diagnosed with a common cold, prescribed extra-strength Guaifenesin and Motrin, and directed to follow up if symptoms did not resolve.

On October 25, 2018, Decedent presented for a follow-up primary care exam with complaints of migraine headaches, pain in the right-side abdomen, and cough and shortness of breath when walking. Her bloodwork and urinalysis returned normal.

Decedent was last seen at ENY on November 30, 2018, prior to her cancer diagnosis. Her walk-in exam was performed by nurse practitioner Corine Armand. Decedent complained of bilateral arm pain and facial swelling. She was diagnosed with allergic dermatitis, prescribed Benadryl, and advised to go to the emergency room if she had worsening symptoms, chest pain, or shortness of breath.

On December 2, 2018, Decedent presented to the emergency department of Brookdale Hospital Medical Center with facial swelling. On respiratory exam her breathing was normal, though she reported wheezing and a history of asthma. She was discharged the same day with a follow-up appointment.

On December 7, 2018, Decedent presented to the Kings County Hospital Center emergency department with persistent facial swelling and difficulty breathing. An abnormal chest x-ray, followed by a CT scan on

December 8, 2018, revealed a 2.0 x 3.1 x 1.7 cm pulmonary mass. Her facial swelling was ultimately diagnosed as superior vena cava syndrome secondary to the mediastinal mass. She underwent three rounds of chemotherapy in January through May 2019, but ceased due to side effects. After approximately one year of treatment for non-small cell lung cancer, adenocarcinoma type, she passed away on February 23, 2020.

Plaintiff alleges that ENY, through its physicians and nurses, departed from the standard of care by failing to order proper diagnostic and preventative testing, specifically chest x-rays or low-dose CT scans, during Decedent's treatment from August 2017 to February 2018. Plaintiff further alleges that these departures proximately caused a delay in Decedent's cancer diagnosis which led to her worsened condition and death.

As an initial matter, the movants argue that "Plaintiff's allegations . . . are limited to treatment after November 1, 2018" and "the Court should limit all arguments to care rendered on November 1, 2018 and after." The notice of claim related to this action stated that "[t]he claim arose on or about November 1, 2018, and *prior and subsequent thereto,* the dates of treatment of claimant herein at East New York Diagnostics & Treatment Center." The bill of particulars sets forth the relevant dates as "on or about November 1, 2018 and *all such dates* where Plaintiff's decedent received care and treatment at East New York Diagnostic and Treatment Center. Decedent's ENY records span from November 2013—December 2018 and included routine and intermittent treatment for various conditions and symptoms. The movants therefore argue that the notice and pleadings were "impermissibly vague" regarding Decedent's relevant dates of treatment prior to November 2018.

However, the movant's argument is *not* based on the statute of limitations, nor do they discuss the related doctrines of continuous treatment or failure to diagnose cancer/malignant tumor. As this position has not been argued by the movants, the Court makes no determination herein on whether any of Plaintiff's claims or relevant dates of treatment are time-barred. Rather, as the movants base their argument on the dates set forth in Plaintiff's notice of claim, complaint, and bill of particulars, the Court will base its decision upon review of the treatment covered by the opinions of the experts in this case.

In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing

3

[* 3]

either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure" (*Rosenzweig v Hadpawat,* 229 AD3d 650, 652 [2d Dept 2024]). "In order to sustain this prima facie burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's complaint and bill of particulars" (*Martinez v Orange Regional Med. Ctr.,* 203 AD3d 910, 912 [2d Dept 2022]). "Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (*Rosenzweig,* at 652 [2d Dept 2024] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023]).

In support of their motion for summary judgment, NYCHHC submits an expert affirmation from Jeffrey G. Schneider, M.D. ("Dr. Schneider"), a licensed physician board certified in internal medicine and medical oncology.

Dr. Schneider addresses whether the ENY providers failed to perform low-dose CT scans to screen for lung cancer, which Plaintiff asserts as a claim in relation to Decedent's August 22, 2017 visit. Dr. Schneider opines that it was the standard of care to perform routine lung cancer screening with low-dose CT scans *only* for "individuals aged 55-74 years" with a history of smoking over 30 years, based on recommendations from the American Cancer Society. During the time at issue, Decedent was 52-54 years old[1], and she did not turn 55 until November 2019. Thus, Dr. Schneider opines that the physicians and staff at ENY were never required by the standard of care to perform lung cancer screening by low-dose CT scan on Decedent, in the absence of other symptoms warranting such tests. He further opines that "her cancer was essentially non-symptomatic" until

---

[1] Decedent was born on November 3, 1964. She was 52 years old at the time of the August and October 2017 visits, 53 years old at the time of the February 2018 visit, and 54 years old on her last visit to ENY on November 30, 2018.

4

[* 4]

November 2018, and her various complaints such as headaches, leg edema, neck rash, and acute cough with fever and nasal congestion were not indicative of lung cancer.

Dr. Schneider further opines that it was not the standard of care to perform regular chest x-rays to screen for lung cancer in asymptomatic patients. He notes that at one time, the American Cancer Society had recommended lung cancer screening with chest x-rays for heavy smokers, but this recommendation was changed in 1980 due to the lack of "convincing evidence" that such screening was effective, and it was "indisputably not the standard of care" in 2017-2018 to use routine chest x-rays for that purpose.

Dr. Schneider opines that Decedent did not exhibit any symptoms consistent with lung cancer during her ENY health exams or walk-in visits, and "her cancer was essentially non-symptomatic until she presented on November 30, 2018 with signs and symptoms of superior vena cava syndrome." On October 25, 2017, he opines that her wet cough with sore throat and nasal congestion did not suggest lung cancer, and she was appropriately treated for an upper respiratory infection.

Similarly, Dr. Schneider opines that her sore throat on February 26, 2018 was not consistent with lung cancer and instead indicated she had a common cold. He notes that she had returned to ENY several times between these two visits on November 27 (routine follow-up), December 2 (heel pain), January 30 (gynecological exam), and February 8 (foot pain), and there was no indication her cough or other symptoms persisted in the interim. Thus, he opines that she was appropriately treated for acute cold symptoms and directed to follow up with her primary doctor. He further opines that a CT scan would not be warranted unless her symptoms failed to resolve or worsened. He notes that she did not return to ENY for eight months and never reported whether those symptoms persisted.

Dr. Schneider opines that on October 25, 2018, her symptoms of abdominal pain were not indicative of lung cancer. Although she did have a cough and shortness of breath, she denied any chest pain or discomfort. He opines that no additional testing including CT scan was required by the standard of care at that time.

5

[* 5]

On November 30, 2018, shortly before her cancer diagnosis, Dr. Schneider opines her evaluation and treatment by the ENY physicians was in accordance with the standard of care, and she was properly advised to seek emergency treatment if her facial swelling or other symptoms worsened, which she did.

On the issue of proximate causation, Dr. Schneider opines as an internist and oncologist that no alternate treatment or earlier detection on the dates at issue would have changed the course of Decedent's illness. Dr. Schneider states that Decedent was ultimately diagnosed with stage IV non-small cell adenocarcinoma with low-level PDL-1 expression, which he opines was nonresectable and "less responsive to immunotherapies," due to the nature of the cancer type and "its local advancement and metastasis to the patient's mediastinum and liver." He notes the short period of time between her October-November 2018 visits and her December 2018 diagnosis and opines that earlier detection at that time would not have impacted her prognosis or treatment. He further opines that even if she had been diagnosed as early as October 2017, this cancer was already "advanced" and would not have been treatable. Therefore, he opines no alleged departures of ENY were the proximate cause of her injuries or death.

NYCHHC also submits an expert affirmation from Brian Feingold, M.D. ("Dr. Feingold"), a licensed physician board certified in internal medicine.

Dr. Feingold concurs with the opinion of Dr. Schneider that annual lung cancer screening is recommended for patients 55-74 years old with a 30-year or longer history of smoking, and Decedent did not fall into this category because of her age. Therefore, he opines the ENY physicians did not depart from the standard of care by not performing or recommending a routine low-dose CT scan in the absence of symptoms. Dr. Feingold also opines that it was not required by the standard of care to use routine chest x-rays to screen for lung cancer, "as there are no studies showing any effectiveness to doing so."

Dr. Feingold opines that Decedent's symptomology did not require a CT scan or chest x-ray at any time from October 25, 2017 through November 30, 2018. Dr. Feingold notes that she did not present with the symptoms most concerning for lung cancer on these visits, i.e. coughing blood, weight loss, chronic shortness of breath, or chronic cough.

6

[* 6]

Specifically, Dr. Feingold opines that she presented with symptoms associated with an upper respiratory infection on October 25, 2017 and common cold on February 26, 2018, due to the presence of nasal congestion and sore throat. He opines that there was no indication for a CT scan or other imaging based on these symptoms, and those tests would only be indicated if her cough "had persisted in a chronic manner." Based on the fact she did not report continuing symptoms after these visits, the expert opines that her cough appeared to be an acute condition that resolved with treatment.

Dr. Feingold further opines that on the October 25, 2018, Decedent's complaints did not indicate that a CT scan was required by the standard of care. He notes that she had new complaints of abdominal pain unrelated to her previous symptoms, and although she did report a "cough," she did not indicate it was a continuation of her cough from several months earlier.

Finally, Dr. Feingold opines that Decedent's treatment on November 30, 2018 was in accordance with the standard of care. He opines that she was treated for her primary complaint of facial swelling and appropriately advised to seek emergency treatment if those symptoms continued or worsened. He opines there was no reason based on her complaints at that time to perform a CT scan.

NYCHHC submits a third expert affirmation from Seena C. Aisner, M.D. ("Dr. Aisner"), a licensed physician board certified in anatomic pathology, clinical pathology, and cytopathology.

Dr. Aisner opines on the issue of proximate causation from a pathology standpoint. She notes that Decedent was diagnosed with non-small cell lung cancer, adenocarcinoma type, in December 2018. Based on her review of Decedent's subsequent medical records, Dr. Aisner opines that she had stage IV cancer at that time, and it was unresectable. She opines that her PDL-1 marker of 10% indicates that her cancer "could be less receptive to immunotherapy alone." From this time, the expert opines that Decedent's prognosis of survival was 6-10 months without treatment. After unsuccessfully undergoing some sessions of chemotherapy, she ultimately died approximately 14 months after her diagnosis.

Dr. Aisner opines that due to the "slow growing and stable nature of her disease," it was likely present and undetected for several years. She opines that Decedent's first symptoms of cancer did not present until she

7

developed superior vena cava syndrome in November 2018. Dr. Aisner opines that even if she had been diagnosed as early as October 2017, her lung cancer was already advanced and inoperable by that time, and no alleged departures at ENY would have changed the course or outcome of her disease.

In addition to their expert affirmations, NYCHHC submits a personal affirmation from David John, M.D. ("Dr. John"), an employee of ENY who affirms that he was the "collaborating physician" who acted as director and supervisor of nurse practitioner Corine Armand on the February 26, 2018 and November 30, 2018 visits. Dr. John affirms that it was his practice as a physician at ENY to "supervise" the nurse practitioner, "discuss . . . the diagnosis and recommendations," and "ensure that the diagnosis and recommendations were reasonable."

Based on these submissions, NYCHHC has established prima facie that there were no departures from the standard of care in Decedent's treatment at ENY from October 25, 2017 through November 30, 2018, setting forth expert opinions that her clinical symptoms on these dates did not warrant a CT scan or other testing. NYCHHC's experts also established that the standard of care did not require her primary care physician at ENY to perform low-dose CT scans for lung cancer screening based on her age and history of smoking.

The experts have further established prima facie that Decedent's treatment on these dates was not a proximate cause of her claimed injuries or death. The oncology and pathology experts opine that in 2017 her cancer was already too advanced and non-responsive to treatment for the alleged delay in diagnosis to change the course of her treatment or her death. Therefore, the movants have met their prima facie burden on the medical malpractice and wrongful death claims. The burden shifts to Plaintiff to raise a triable issue of fact on these issues.

In opposition, Plaintiff submits an expert affirmation[2] from Richard J. Hirschman, M.D. ("Dr. Hirschman"), a licensed physician board certified in medical oncology and hematology. Contrary to the

---

[2] This summary judgment motion was initially granted on default, without appearance or opposition filed by Plaintiff. Upon motion by Plaintiff (Seq. No. 3), this Court vacated that order and reinstated this motion. Plaintiff did not annex a new expert affirmation to this motion, and instead cites the expert affirmation previously e-filed as part of their motion to vacate (NYSCEF Doc. No. 96).

8

movants' arguments in reply, the Court finds Dr. Hirschman has adequately established his qualifications to opine on the issues herein. It is noted, however, that in one paragraph the expert erroneously refers to the standard of care in "geriatric medicine" and names an incorrect defendant. That non-party and medical subject are not relevant to this action.

Dr. Hirschman sets forth alleged departures from the standard of care which occurred on August 22, 2017, October 25, 2017, and February 26, 2018. However, he does not counter the movants' experts that Decedent's treatment in October-November 2018 complied with the standard of care, and that no departures on the October-November 2018 dates proximately caused her injuries or death.

First, Dr. Hirschman opines that the treating physician at ENY departed from the standard of care by failing to order a low-dose CT scan on August 22, 2017, when she presented for a routine follow-up exam with complaints of headaches, bilateral leg edema, and a neck rash. Although he acknowledges that she was below the 55-74 age guideline cited by the movants' experts for asymptomatic patients, he states without detail that a CT scan should have been ordered "in light of her smoking history and symptomatology."

Next, Dr. Hirschman opines that a chest x-ray should have been ordered or performed on October 25, 2017. He notes that her chest examination was clear and her symptoms included a cough with green secretions, fever, and sore throat. Dr. Hirschman opines that a chest x-ray should have been performed, and a differential diagnosis "should have included pneumonia and even lung cancer." Dr. Hirschman also states that it was a departure from the standard of care that Decedent was examined on that date by a nurse practitioner, and she alone made "clinical decisions" on Decedent's diagnosis and treatment.

Third, Dr. Hirschman opines that it was a departure from the standard of care not to perform a chest x-ray on February 26, 2018, when Decedent again exhibited symptoms including a cough and chest discomfort. Dr. Hirschman opines that a chest x-ray was indicated "at the very least . . . to rule out pneumonia" in light of her "chronic signs and symptoms of chest infections."

On the issue of proximate causation, Dr. Hirschman counters the movants' experts that Decedent's prognosis and course of her lung cancer would not have been altered by earlier diagnosis and chemotherapy. He

9

notes that the mass that was discovered in December 2018 was 2.0 x 3.1 x 1.7 cm in size, or 10.54 cm in volume. He opines that adenocarcinoma of this kind "doubles in volume approximately every four to five months," and based on that calculation it likely would have been only 1 cm on October 25, 2017. He opines that if a chest x-ray had been performed at that time, in accordance with the standard of care, the mass would have been significantly smaller but "noticeable" enough to appear on the chest x-ray. At this early stage, he opines that her mass would have been "essentially curable in terms of lung cancer" with a 5-year survival rate of 92%. Thus, he opines that the alleged departures from the standard of care in October 2017 proximately caused her delay in diagnosis, and this was a substantial factor in her worsened prognosis and death. He also opines that it was still "not too late to potentially treat and cure" her cancer with chemotherapy by February 2018.

Based on evaluation of these submissions, Plaintiff's expert opinions on ENY's departures from the standard of care are conclusory, speculative, and unsupported by the record. With respect to the standard of care for providing low-dose CT scan cancer screening – which Plaintiff asserts as a claim in connection to Decedent's August 22, 2017 exam – the expert does not dispute the statements of Dr. Feingold and Dr. Schneider that Decedent was outside the minimum age range (55) for asymptomatic patients with a 30-year smoking history. Nevertheless, Dr. Hirschman opines without detail that she should have been given a low-dose CT scan "in light of her smoking history and symptomatology." He does not elaborate on what symptoms she exhibited on August 22, 2017, aside from the redundant and contradictory statement that "she was symptomatic in her presentations of being a 30-pack-years smoker." He does not address that her only complaints in the medical record at that time were migraines, leg edema, and an acute rash. As such, the opinion that she was a candidate for low-dose CT scan cancer screening based on her "symptomatology" is not supported by the record, and it is insufficient to raise an issue of fact as to the defendants' liability.

Dr. Hirschman's opinions that Decedent should have received a chest x-ray on October 25, 2017 and/or February 26, 2018 are also speculative and contradicted by the record. He does not counter the opinions of the movants' experts that this test is not appropriate for cancer screening purposes. He also fails to address the opinions of Dr. Feingold and Dr. Schneider that her symptoms of fever and sore throat indicated an upper

10

[* 10]

respiratory infection or common cold rather than lung cancer, and that those symptoms did not warrant any further testing unless they persisted after treatment. Dr. Hirschman acknowledges that her chest was clear on examination but opines that if a chest x-ray had been performed, based on a differential diagnosis of *pneumonia,* it would have incidentally revealed her lung mass at an early stage. Dr. Hirschman fails to substantiate with evidence that the standard of care required a differential diagnosis of "pneumonia and even lung cancer" based on her symptoms. His opinions regarding this alleged departure are therefore speculative and controverted by the record.

Dr. Hirschman states that Decedent exhibited "chronic" cough and chest infection symptoms in February 2018, but never addresses that Decedent returned to ENY multiple times in the months before that visit – including for a routine general health exam on November 27, 2017 – and the medical record consistently showed her chest was "clear" and she did not exhibit a cough or other persistent symptoms. Additionally, according to her chart, she reported her cough, nasal congestion, and chest discomfort on February 26, 2018 had only manifested in the previous week. Thus, Plaintiff's expert does not properly address the facts or counter the opinions the movants' experts that Decedent's symptoms in February 2018 were consistent with an acute cold, not a chronic condition, and that she was appropriately directed to seek further care if they did not resolve.

Plaintiff's expert further opines that it was a departure from the standard of care for a nurse practitioner to be "given the authority to make the medical diagnosis," and the ENY nurse practitioners inappropriately made "clinical decisions" in diagnosis and treatment. However, this allegation is without any basis in the record. Plaintiff's expert does not address the affidavit from Dr. John, the ENY collaborating physician, who stated it was the practice of the clinic for physicians to supervise the nurse practitioners and review their determinations. He also affirmed that he personally directed and supervised N.P. Armand on the two dates she was listed as the "visit provider." Plaintiff has therefore not raised a genuine issue of fact as to the nurse practitioners' authority or decision-making.

Finally, Dr. Hirschman does address the issue of proximate causation by opining that Decedent's cancer would have been treatable if discovered in October 2017 or February 2018. However, his failure to establish

11

that ENY departed from the standard of care on those dates by not performing further tests is fatal to their opposition of this summary judgment motion. Because Plaintiff has not raised a genuine, triable issue of fact as to ENY's liability for medical malpractice or wrongful death, the summary judgment motion must be granted.

On the issue of informed consent, the movants make a legal argument that this claim should be dismissed as inapplicable. There is no dispute that the claims herein involve ENY's alleged failure to appreciate certain symptoms, perform appropriate tests, and timely diagnose Decedent's lung cancer. It is well established that a failure to timely diagnose and treat does not constitute an "affirmative violation of physical integrity" as required in a lack of informed consent claim (*S.W. v. Catskill Regional Med. Ctr.*, 211 AD3d 890, 891 [2d Dept. 2022]; Public Health Law § 2805-d [2]). Therefore, the movants have established prima facie entitlement to dismissal of the lack of informed consent claim, and Plaintiff does not raise any issues of fact or oppose that part of the motion.

Lastly, because all causes of action sounding in medical malpractice are dismissed, the derivative claims for loss of services asserted by Plaintiff must also be dismissed.

Accordingly, it is hereby:

**ORDERED** that NYCHHC's motion (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor, is **GRANTED**, and this action is dismissed in its entirety.

The Clerk shall enter judgment in favor of NEW YORK CITY HEALTH AND HOSPITALS CORPORATION.

This constitutes the decision and order of this Court.

**ENTER.**

_____

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

12

[* 12]